and Counsel for the Appellants. Mr. I'll let you pronounce it first. Thank you, Your Honor. May it please the Court, Ryan Bengert with the Missouri Office of Attorney General on behalf of the Department of Corrections and Corizon, the defendants below, the appellants above. Your Honors, the central question in this appeal is whether evidence of a common policy concerning treatment of inmates with chronic hepatitis C taken alone is sufficient to certify a class of thousands of inmates with widely divergent medical needs. The district court below did not consider expert testimony. It did not hold an evidentiary hearing with witnesses. No discovery has been taken in this case to date. The evidence considered by the court included two affidavits, one of which the court later discarded, and a handful of documents, most of which were attached to the plaintiff's reply brief in support of class certification. In short, no rigorous analysis was conducted by the court below. Despite that fact, and despite the relative dearth of evidence, the district court certified a class of all Missouri inmates, future and present, with chronic HCV, hepatitis C, whether asymptomatic or suffering from advanced complications. For the purpose of deciding the question of whether that policy, the policy concerning treatment, violates the Eighth Amendment to the U.S. Constitution and the Americans with Disabilities Act. Now, Your Honors, the central problem with the district court's decision is that it conflicts with the teaching of Wal-Mart v. Dukes decided by the U.S. Supreme Court. In Wal-Mart v. Dukes, the court held that certification depends not on the raising of common questions, even in droves. Anyone can do that. But on the capacity of the class proceeding to generate common answers that will drive the resolution of the case. The question that was raised in this case is whether the defendant's policy concerning treatment violates the MDOC's custody with HCV. Well, in the Wal-Mart case, there was concern about the discretion that the individual supervisors or managers had. Here, I think the district court was pretty clear in distinguishing it by saying, this policy actually takes away discretion, so we're really not in the Wal-Mart world. So, and that seems to me an important distinction, that they're actually directing everyone to be treated the same, even when perhaps they're not. Your Honor, I think that's a — that doesn't quite get the policy just right. And I think the district court got it wrong. The policy — the policy the district court framed was a policy of not treating inmates with hepatitis C using direct acting antiviral drugs, otherwise known as DAAs, unless they have an APD, which is a drug with an APRI score greater than 2.0. APR is simply — APRI is simply a diagnostic tool that measures certain levels of enzymes in the body of an inmate. Now, the policy does allow for discretion, because there's a wide — there's a continuum of care. There's a continuum of treatment. No two — And, and I understood, though, that the diagnostic tool wasn't their — wasn't their concern, that that was a bit outdated, and so it was not a sharp enough tool to actually determine whether someone might — might need the drugs. Your Honor, and that gets to a very — a central issue that I think is a flaw in the district court's reasoning. The district court came to the conclusion that it could answer this question of whether the policy, which — which the district court and the plaintiffs have framed as being an outdated policy, whether it could answer the question of whether that policy violates the Eighth Amendment with respect to every single member of the class. And the question is not whether the policy is outdated. Rather, as Judge Ikuda on the Ninth Circuit said in his dissenting opinion — Dissent. — in response to the denial of en banc. And, again, this is in the Parsons case, where the Ninth Circuit certified a class of over 30,000 inmates, many of whom had no discernible medical conditions. And he said in that case that when you look at Rule 23 in the Eighth Amendment context, you have to look not just at the question of whether common questions are posed, but how that question interplays with the claims that are asserted and the evidence. Well, let me ask — let me ask this, then, in this particular context. It seems like we've got kind of an unusual medical situation. We don't often get what — I guess what we've been referring to is about as close as a magic pill as you can get for hepatitis C, right? I mean, this is a dramatic swing in the progress of medicine in New York. And we've been dealing with this particular problem. I think that's fair, isn't it? Your Honor, direct-acting antiviral drugs are a good development in the treatment of HCV. There's no question. I would say very — very good, maybe. One could — It's really good. One could qualify as fair. I guess my point is, this seems to be — and I appreciate what you're arguing in that medical care is so individualized that it's very difficult to conceive of sort of a policy that would affect everyone. But I wonder if this particular policy is a little different or significantly different in a meaningful way because of the nature of the treatment where you can get to someone, as I understand it correctly, early, and maybe they don't have any negative consequences of the virus at all. Your Honor, this isn't — Go ahead. To answer your question, Judge Kelly, no one disputes that the development of DAA drugs is a very good thing in the treatment of HCV. The question here, though, is whether the Court can properly answer the question of whether that policy is constitutional as applied to every single inmate with HCV. And the evidence in the record demonstrates that not all inmates with HCV are equally situated. In fact, they're very differently situated. There's evidence in the record from Dr. Bredeman. It's at the appendix, pages 142 through 150, where he lays out the gradations between these inmates. Some of them have advanced forms of HCV, where they're suffering from advanced fibrosis or even cirrhosis of the liver, which is a precancerous condition. Those types of inmates are usually suffering from severe complications. Treatment, of course, for those inmates is available under the policy. But there's also the other end of the spectrum. There are those who suffer from HCV in a chronic form but yet have no symptoms. They're asymptomatic. And as Dr. Bredeman points out, they may never develop fibrosis or cirrhosis based upon medical knowledge. And so you have a — Yes, Your Honor. Isn't this a different situation when you understand that this is a medication that if it's available early, they're looking at actual cure rates of up to 90% for a communicable disease with a confined population. And the adverse impact of non-treatment may be death. And doesn't that look different than just this sort of cumulative care thing that you're talking about? Your Honor, and there may be instances, and I don't want to speculate too far, but there may be instances where an inmate who is suffering from HCV brings an individual Eighth Amendment claim and may be able to make out a claim based on their own individual circumstances. But there's also evidence in the record from Dr. Bredeman that some patients suffering from chronic HCV, it may be dangerous to give them DAAs and that they may be suffering from comorbidities such as hepatitis B. There are always people that are contraindicated. I get that. But what I'm looking at is just this is a policy that's going to allow people to remain in a confined population where other people are susceptible to acquiring the disease, right? Because hepatitis C is communicable. And you're just going to wait until they're bad enough. And that's really what the policy — what this dated policy, which apparently predates the widespread availability of these drugs, that's the policy you have. And doesn't that implicate the Eighth Amendment in some way or fashion? No, no. With all due respect, I would push back gently on this. No, go ahead. Push back strongly. That's the whole point of the argument. I would push back with some conviction on the notion that the policy simply dictates that we will wait until they're bad enough to treat, because the evidence suggests — the evidence indicates that there are some patients who will never get bad enough. They will never develop fibrosis or cirrhosis of the liver. And for those patients, it's unnecessary. In fact, the district court even recognized in its own opinion that members of the class, certain members of the class, did not need and would not need treatment with direct-acting antiviral drugs. And this gets to the issue that is framed by Walmart versus Dukes. Is this a situation where the class that's certified, you can answer the question for the entire class in one stroke? In one stroke. And maybe we're sort of looping back again to the same spot. But I guess I have a question about the folks who you say, well, there's some people who may never need the medication. When do they find out? I guess the question being, if you have to wait until you're actually damaged before you say, oops, I should have done it, isn't that put you in a class where you could be damaged if you don't have at least access to an assessment to determine whether you could get the drugs before the damage comes around? And so it seems to me an Eighth Amendment claim, after you've got fibrosis or cirrhosis, seems a little, little bit late in the game when you had the drugs initially that could have prevented that. Your Honor, a couple of issues there I want to unpack. One, this is not a situation where you're waiting until they've suffered damage to treat. All along the continuum of care, they're being monitored, counseled, they're being assessed and diagnosed all along the way. They're put into a chronic care clinic. And the evidence in the record shows that. So they're not being left adrift with no treatment. They are being monitored and cared for. But to the Eighth Amendment point, it's very clear in the law that an Eighth Amendment claim does not exist when there's simply speculative, hypothetical or possible future injury. But rather, there must be deliberate indifference to a serious medical need. And as the Binder case, which we've cited, makes clear that medical need is not simply a serious condition, but a serious medical need for treatment, for treatment. And the deliberate indifference prong is also very important here with respect to the imminence requirement. Because a deliberate indifference is not simply deliberate indifference to a potential hypothetical harm, but to a serious risk of substantial and imminent injury. And the imminence piece is substantially lacking here for a large portion of the class and an unknowable portion of the class. And so if you look at, and again this gets back to Akuta's, again in dissent, but Akuta's opinion in the Parson case, where he pointed out the flaw by the majority and the flaw by the judges who refused en banc consideration was that they were looking only at the common question. Can this policy be set up or down, be judged as constitutional? But that's not enough. Under Walmart, you have to ask, can that decision be made for the entire class in light of the claims pled and in light of the evidence in the case? Here, the claim pled is an Eighth Amendment claim, which requires deliberate indifference, a showing deliberate indifference, which is akin to criminal recklessness. It's a very high standard. It's not just medical negligence. It's not just simply failure to keep up with the cutting-edge standard of care. And that's because we're looking not at are we giving them cutting-edge care, we're looking at whether or not they're suffering from some sort of cruel and unusual punishment by wanton infliction of pain. That's not what's happening here. They're being given care. What specifically, what will this injunction require your department to do that it is not presently doing? Your Honor, the plaintiffs have asked for a number of different, a number of different pieces of relief. Their lead claim, which the district court discarded along the way, it didn't certify this claim, was for immediate treatment of all HCV-suffering inmates with direct acting on antiviral drugs. Right now, the plaintiffs, as it's framed in the court's order, the court wants us to simply discard our policy, which the court frames as refusing DAA treatment to those inmates whose APRI score is not sufficiently high enough. I think 2.0 is the score that the court was looking at. So it would be to discard that. But I think the effect of that, Your Honor, would be that a lot of these inmates are going to be forced into treatment with DAAs who may not need them, as the court has recognized. And to get to your point, you're getting to the 23B2 cohesive injunction point. Is there really an injunction that can be issued for the entire class that would answer the question? The answer is no, because not all members of the class are entitled to an injunction. Because they haven't demonstrated the sufficient injury and harm under the Eighth Amendment. So there is no cohesive injunction that would address properly all of the class members' conditions. There's something sort of off-putting about saying, well, as long as we have a policy that catches the people when they're far enough along the way, it's okay. Up until then, we're not deliberately indifferent to anything. Your Honor, I wouldn't... There would appear to be a sort of heartlessness in it. Your Honor, I don't think it's heartless, because the DOC... Well, I can see it the other side, because I can see a multitude of 1983 cases coming up. Well, anyway, enough of my extemporizing. I've used some of your rebuttal time, so I'll compensate a little bit for my question. Thank you, Your Honor. We'll hear from the appellees. Mr. Rother. Good morning, sir. Good morning. May it please the Court. You may proceed. Chronic HCV does have an almost cure now, and the medical standard of care is that almost everyone should get treatment. It's a little disingenuous to say that the Missouri Department of Corrections is treating people when one-third of 1% of the people who have chronic HCV are receiving DAA drugs. There are thousands of Missouri prisoners that have chronic HCV. There's this effective treatment. About a dozen of those inmates are being treated in accordance with the standard of care each year. The reason why most of the prisoners with chronic HCV are not receiving treatment is because of this policy, and the policy forces medical treatment decisions for this particular malady, just for HCV, to be made without regard to the prevailing medical standard of care. So when you say that, are you talking about just the diagnostic tools at this stage? In other words, identifying those folks at various stages of the disease? Well, an APRI score measures fibrosis, and fibrosis is one of the factors that you can take into account to determine what the status of HCV is and where it is. But to use it exclusively leaves out people who need DAA treatment but have had other symptoms or are going to develop other symptoms other than fibrosis. And it delays treatment for people who are going to develop fibrosis or cirrhosis that's not reversible, and it delays treatment for them. So it's that policy of making treatment decisions based on something that really doesn't measure, according to the medical standard of care, doesn't measure the need for treatment. It would be as if you had diabetics that you were using. Some diabetics, very severe diabetics, may have seizures. But if you waited and you required that someone have a seizure before we even give them insulin, that would be putting them at substantial risk of serious harm because instead of using the medical standard of care, the prevailing medical standard of care, you'd be waiting until something that's associated with diabetes but is not indicative of whether or not there is a need for treatment. And it excludes far too many people. And that's exactly what using the APR I-score is. We contend. I mean, if we're wrong about that, then we would lose on the merits. But the question here is whether the legality of keeping this policy going forward should be decided in a single case for prospective relief or whether these 5,000 inmates should each file their own lawsuit and get a separate determination of whether or not there should be injunctive relief. What we're seeking is a treatment protocol that accords with the prevailing standard of care. It's based on the same common policy that we're challenging and common evidence, which is the existing policy and what the standard of care is. This is exactly what Rule 23b-2 was designed to avoid. It seems like the problem, though, is that even with a standard policy, you still come back to individualized medical care. And every single person, in this case, inmate, who comes forth is still going to have their own individual presentation of the disease. And so that sort of at least has a sense of individualized results and not a common answer to the common question. I would completely agree that this was a class action for damages where the harm is different. What we're arguing, and I think the State is conflating injury, the constitutional injury and the harm. The injury, the Eighth Amendment injury, is the exposure to the policy that creates a substantial risk of harm. That's always the standard in the Eighth Amendment. And since Hlinghurst against McKinney, the Supreme Court has said that you don't have to wait until you get, you don't have to wait for the future harm to come before you can mount an Eighth Amendment claim. And so what, in seeking prospective relief, is we're trying to prevent those harms from ever coming to pass. It's the exposure to harm. So your view is that every inmate who has HCV is subject to the same substantial risk of harm as a result of this policy? Yes. And that's even though they come to the situation with their own individual medical condition, for lack of a better description? Well, there are two answers to that. First, generally, yes. The exposure to the policy creates a substantial risk of harm. When the decision whether or not to treat is made on something other than the prevailing medical standard, there's a risk of harm. That harm, not to be too dramatic about it, will be death for some people. For some, it will be fibrosis or cirrhosis or cancer. For some, it may be no harm. But it's a substantial risk of harm. And if we had to show the actual harm, that would be different than what the test is for the Fifth Amendment or Eighth Amendment, sorry. The second question, though, or the second piece of that question is, are they in a different medical situation? And the way the class has been defined is they all have chronic HCV. And the relief we're seeking is that they receive care that is consistent with the prevailing medical standard. So the prevailing medical standard. And in real world time, what would that mean? If your policy, if your plea for relief is granted, what will the department be required to do on a day-to-day basis? Well, the medical standard, which is the standard of care as it exists now, is in the record at pages 458 to 465. And they'd have to make decisions based on the standard of care rather than making decisions based on APRI scores. So for some people, DAA drugs would be contraindicated. In the record at page 515, there's an affidavit explaining people have less than 12 months to live and DAA drugs wouldn't change that. Not appropriate to give them DAA drugs. At page 598, there's a list of drugs for which DAA treatment is contraindicated if you're receiving these other treatments. But, I mean, most people, if you follow the medical standard of care, would be treated with DAA drugs. Well, basically your claim is that the injury is the denial of consideration for DAA treatment. Is that your claim? Well, it's more than that. But, yes, the decision is being made based on the medical standard of care. And, you know, while there are, when you make a decision, medical decisions for someone, life and death decisions for someone, based on other than the medical standard of care, you can be, and in this case are, putting them at substantial risk of harm. And maybe this is, well, the policy is about the screening and making sure that they're being tested properly, right, to see whether they are candidates for the drugs. What's the next step? I mean, at this point, we're not dealing with whether or not the Department of Correction could or would supply the drugs, are we? No. The only relief, the relief that we're seeking is a single stroke of the pen. The defendant shall formulate and implement a HCV treatment protocol that comports with or meets the prevailing standard of care. And does that protocol, I mean, the substance of that protocol, is that the diagnostic part of it or are we delving into whether or not the Department of Corrections could or would or be able to afford the drugs that I understand are relatively expensive for these thousands of people? Is that a part of the remedy that's being sought? Well, it would be on the Department of Corrections to actually formulate the particulars of the policy and what the standard of care will be when that injunction comes may be different than it is today because three years ago the standard of care was different than it is now. The defendants haven't raised cost as an excuse for not providing treatment. And the Seventh Circuit has said that administrative convenience and cost in some circumstances may be permissible factors to consider but not to the exclusion. But that's not part of what we're talking about here today. It's not a novel argument that the exposure to policy that causes a substantial risk of harm is the Eighth Amendment injury. And Brown against Plata, it was the exposure to the ‑‑ the exposure to policy was a constitutional injury even though it might result in a range of harms from no harm at all to death. And Brown versus Plata relied on Farmer against Brennan from 1994, which likewise talked about the exposure to the policy that creates the substantial risk of harm. So whether or not a particular individual experiences the worst harm or a lesser harm or no harm at all is not important in looking at prospective relief under the Eighth Amendment. It's whether they're being put at a substantial risk of harm. There was some argument in the briefs about whether we had to show evidence that each member of the class has standing. All the members of the class have to have standing. We agree with that. And Halberstin against Auto Owners Insurance Company, this court's 2013 case, held that there's no requirement that each member of the class submit evidence of personal standing. We just need to show that they're exposed to the policy. And each person who has chronic HCV and is not receiving DAA drugs is exposed to the policy of a decision about their treatment being made not in accordance with the medical standard of care for non-medical reasons, essentially. Because there are thousands of putative class members and they are all exposed to a policy that creates a substantial risk of harm to them, the class is certified to ask only one question, whether legally this policy can be applied prospectively. What about the issue of the level of proof that was provided initially? That didn't come in until your reply brief, maybe? So initially, the evidence was the actual evidence. Initially, it was based on allegations in the complaint. This court hasn't said definitively yet whether or not that's enough after Dukes. And so that was an objection raised in opposition. So in the reply brief, evidence, including affidavit and documents, showing what the policy was, a bunch of letters to inmates explaining why they weren't getting HCV treatment were included. The other side was allowed to file a SOAR reply, in which they provided evidence as well. Did anyone ask for a hearing on that? No one requested a hearing. And the court, the district court, found that evidence wasn't necessary but also said, but I'm going to turn to it anyhow since it's been provided. So this was, there was evidence. This is early in the case, but we believe it's important to be allowed to certify a class in this case early so that discovery can be based on it being a class action. Aren't we permitted to look at the underlying merits of your argument? In other words, it sounds deceptively plausible. I shouldn't say deceptible. I mean, you say a stroke of the pen takes care of this, but the real-world implications are a little bit different. Has any court, how many courts have granted the relief of this nature that you know of? One case has gone to judgment in the southern district of Indiana, and a class defined just like ours was granted the relief that we are requesting. That's the only, there are several other cases that have not yet gone to judgment. Each of them has certified a class that is much like this. Is the underlying issue one of optimal treatment versus adequate treatment? It does not have to be optimal treatment under the Eighth Amendment. It just cannot show deliberate indifference to a serious medical need. And that is a merits question. In other words, those people who need this treatment are getting it by the department officials. Well, if the court, if the finder of fact, believes that treating one-third of 1% of the people who have chronic HCV is giving it to all the people that need it, then we will lose on the merits. Thank you for your consideration, and we ask that the class certification be affirmed. Very well. Rebuttal? Yes. My time is very short. I'll give you two minutes. Okay. Thank you, Your Honor. A couple of things. One, Your Honor, I want to lead off with something that counsel said multiple times, and that is that they're simply asking that the court enjoin the State to implement the prevailing standard of care. But that absolutely gets the Eighth Amendment test wrong. The Eighth Amendment is not a medical malpractice requirement. It is something akin to criminal recklessness, deliberate indifference to a serious medical need, and that serious medical need has to be something that's going to cause substantial and imminent risk of harm to an inmate. So it would not be fair to characterize the test here as whether or not MDOC is following the prevailing standard of care. And what is that prevailing standard of care? Well, it was very clear in the pleadings that the prevailing standard of care that the plaintiffs want to impose would be treatment of all of these HCV-positive patients with DAA drugs, except in very minor circumstances. Your Honor raised a question about cost, and that is a merits question, but that kind of treatment obviously is going to be very, very expensive, probably on the multiple nine figures to the State. And that gets to the question that you raised, Your Honor, which is, isn't this a heartless policy? And, Your Honor, I would push back on that, because this gets to the point. Well, rightly so. It was an overstatement, but you may push back. I would push back on that, because the policy that the defendants are implementing is one that prioritizes care for those inmates with the most substantial and serious medical needs, just like the Eighth Amendment requires. That's the purpose of the current policy. It's not, and that current policy exists because there are limited resources, and the State must make sure that those with the most substantial and serious medical needs are being addressed, just like the Eighth Amendment requires. The plaintiffs want to heighten that burden on the State and impose upon the State an injunction that applies to all inmates requiring the State meet effectively a medical malpractice standard. And, Your Honor, that is simply not the test under the Eighth Amendment. That is not the reason why the Eighth Amendment provides for medical care for inmates. Getting back to the class certification point, just to wrap up, the problem with the question, is this policy constitutional, can be decided for all inmates with the stroke of a pen, with one stroke of a pen. Superficially, that looks attractive. When you look at the evidence, when you look at the claims involved, it simply cannot be done, because for each and every inmate in this class, it cannot be said that simply because they're a stroke of a pen, they're not being cared for, to such an extent that the State is being deliberately indifferent to a serious medical need. Thank you for your argument. The case is now submitted, and we will take it under consideration.